UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-41387
_____


BENNIE J. BROWN,

Plaintiff-Appellee,

versus

KILGORE JUNIOR COLLEGE, ET AL.,

Defendants,

WILLIAM M. HOLDA, President, Kilgore College, individually
and in official capacity; GERALD M. STANGLIN, Vice President
of Instruction, Kilgore College, individually and in
official capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(6:99-CV-464)
_____

June 26, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:[*]

The principal issue in this interlocutory appeal from a
summary judgment denial of qualified immunity is whether there was
a causal connection between the claimed First Amendment protected
activity of Plaintiff Bennie J. Brown and the conduct of Defendants

_____

[*]    Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

William M. Holda and Gerald M. Stanglin, in their individual capacities (Individual Defendants).  **REVERSED** and **REMANDED**.

## I.

Brown is a female faculty member of Kilgore College, a community college district organized under the TEX. EDUC. CODE § 130.001 *et seq.* (Vernon 1991), and a unit of local government, TEX. CIV. PRAC. & REM. CODE § 102.001(2) (Vernon 1997).  Brown has been a member of the English faculty since 1969, holding teaching and administrative positions primarily in the English and Reading department.

Holda has served as Kilgore President since 1996.  Prior to then, he was Dean of Admissions and Registrar there for six years. And, he was an instructor at Kilgore for 15 years before being made Dean.

In February 1997, Stanglin was hired as Kilgore's Vice President of Instruction.  Prior to then coming to Kilgore, he was a dean at Cedar Valley College in the Dallas County Community College District.

In 1990, Brown expressed an opinion on a matter involving a Kilgore trustee's son who, along with approximately 40 other students, had failed an English exit test.  Then Kilgore President Woodruff reinstated the students.  (He left office in early 1993.) Brown felt the situation was resolved in an "unsatisfactory" way and expressed this opinion to her dean and others at several department meetings.

Shortly thereafter, Brown became active in the Texas Faculty Association (TFA), a professional organization established for the advancement of faculty concerns and issues. Among other things, TFA lobbies on behalf of its members before the Texas legislature. According to Brown, shortly after joining TFA, she and other members were informed on a regular basis by unspecified individuals that they "were on a hit list"; *but*, *she concedes she never heard this from either Holda or Stanglin*. (In fact, Stanglin was not even employed by Kilgore during this time period.)

Brown states that, as members of TFA, she and others attended several meetings of the Kilgore College Board of Trustees (some time between 1990 and early 1993) to voice concerns over the size of English classes and "some money that was to be part of our salary". Brown admits she did not verbalize these concerns; instead, Fran Rathburn and Hugh Wink spoke for the group. According to Brown, the meetings were not "audience friendly" and were "not really open".

A 1990 reorganization of Kilgore resulted in a change in job titles and job responsibilities for Brown and others. At that time, Brown was a Director of the Communications Division. Kilgore eliminated all five Division Director positions and replaced them with Department Chairs. All the Division Directors, including Brown, were retained as Department Chairs. Job responsibilities also changed: employment contracts were shortened; Department Chair stipends were increased; and class loads were increased.

3

Because of these changes, Brown requested her department be split, so that she became responsible only for English and Reading classes. And, she maintains she faced retaliation because of her attempts to conduct a salary study following the 1990 reorganization. It took six requests by Brown and two letters from the TFA attorney to receive requested Board minutes, and intervention by others to receive salary information on certain teachers. Brown is unsure, however, whether anyone other than TFA members had difficulty receiving requested records during that time frame.

Brown also believes she suffered retaliation by then President Woodruff (again, he left in 1993) because she, another faculty member, and several computer science professors edited a TFA newsletter. During the early 1990s, when they were attempting a budget study and "running up against a brick wall" in their requests for records, board member Mata told Brown that *President Woodruff* stated, after he read the newsletter: "Bennie Brown would have hell to pay".

As of February 2000 (this action was filed in 1999), Brown was not actively involved in the TFA, and there has been no substantial TFA activity at Kilgore since January 1997. While Brown was elected president the last time elections were held, the organization met two or three times between 1997 and 2000.

With respect to her right to assemble, Brown testified her only recollection of problems occurred "in the early time", *from 1990 through 1993*, and involved her "hearing that ... a college

4

official had sent someone to spy on us[;] that another college official referred to us as a union, and you better watch those troublemakers and union rights people".

*Brown did not know, however, if she ever heard Holda's name connected with any of the stories she heard regarding the TFA.* Brown also acknowledges: *Stanglin* has never criticized her for speaking at college events on behalf of the TFA; and Kilgore provided her with the opportunity to speak on behalf of the TFA when the 1997 fall term began. While Brown does not recall if she actually spoke then, if she did, *Holda* did not criticize her for it; and Brown does not recall *Holda* ever criticizing her for speaking on behalf of the TFA at Kilgore.

Dr. Thornton, who preceded Holda as President of Kilgore, stated: during his tenure, *board chairman Johnston* directed that Brown not be recommended for any promotion and stated that "Brown was not going to be promoted to anything". Dr. Thornton believed Brown to be the best qualified candidate for both the Dean of Academic Instruction position and director of the Workforce Education Department. Brown applied, and was rejected, for the Dean position. The Workforce position was filled without Brown's having an opportunity to apply for it.

Elwyn J. Bone, who became interim Dean of Academic Instruction, following Brown's application in 1993 for that position, stated: she (Bone) retired in 1989, but returned to teach at Kilgore's request in 1993; when Brown applied for the Dean of Academic Instruction position months prior to Bone's returning to

5

Kilgore, Bone recommended Brown for the position; the selection process for the position "was tainted because of improper questions asked of Ms. Brown and other applicants regarding their membership with the [TFA]", which required that the entire process be repeated; and Bone was asked to fill the Dean position on an interim basis, applied for the position, and was given the job over one other applicant (*Brown did not reapply*).

In 1993 or 1994, Bone recommended Brown for the position of director of the Workforce Education Department. *Dr. Thorton* (again, Kilgore President before Holda) told Bone the Board "said never to bring up Ms. Brown's name in conjunction with a job promotion".

In the Spring of 1997, Brown was a Department Chair at Kilgore. At that time, Kilgore instituted another internal reorganization; all Department Chair positions were abolished and replaced with Department Coordinator positions. Brown did not apply for a Department Coordinator position, choosing instead to apply for Dean of Business, Language Development and Technology (BLDT Dean), a newly-created position supervising the division created when the English and Reading department merged into a primarily technical/vocational division.

Stanglin, who had joined Kilgore shortly before, appointed a selection committee. According to Stanglin, the selection committee for the BLDT Dean acted contrary to his instructions and prepared a written recommendation with a rank order of the individuals interviewed. (Earlier published written procedures,

6

however, approved by Holda, provided that the selection committee would rank candidates in order of preference and make a recommendation.) *Brown was ranked third*. Linda Jarvis, selection committee chair, stated the committee did not consider Brown's sex, age, or TFA activity.

After discovering the top-ranked candidate was not qualified for the position, Stanglin determined, based on conversations with selection committee members, that the committee did not have the same level of enthusiasm for the remaining candidates. Therefore, Stanglin decided to appoint a second selection committee and reported this in a memorandum to the Kilgore faculty and staff.

Following the disqualification of the top choice for BLDT Dean, Jarvis voiced her *personal recommendation* of Brown in a memorandum to Stanglin. Jarvis stated: "It is my opinion, as chairperson of the committee ..., that the committee believes that Mrs. Brown is the best, most qualified person for the position of dean, but they are afraid of what they do not know".

In support of Individual Defendants' summary judgment motion, Jarvis reiterated that the memorandum reflected her "personal observations and opinions only. It does not reflect, and was not intended to reflect, the opinion, recommendation or conclusions of the search committee". And, Jarvis stated that, contrary to the allegations in Brown's complaint, the first selection "committee never prepared a report recommending that Ms. Brown receive the appointment as [BLDT] Dean".

7

For the second selection committee, Brown, Randy Lewellen (ranked second, above Brown, by the first committee), and another candidate were selected for interviews. Hugh Wink, committee chair (identified *supra* as a TFA spokesperson to the Board at a meeting in the early 1990s), stated the committee did not consider age, sex, or Brown's activity in the TFA, and did not question Brown about any TFA involvement.

Stanglin attended the meeting where the second committee discussed each candidate's strengths and weaknesses. Stanglin and Holda then met with all three candidates. Stanglin selected Lewellen as the new BLDT Dean. (Lewellen is both younger than Brown and male.)

In support of Brown, another committee member, Jeannie Dykes, stated: Stanglin directed the committee to place nothing in writing; *two committee members* not listed by Brown as references provided "scathingly negative input" about Brown; Dykes believed the appointment of those two members had been previously objected to by Brown; the committee failed to follow published hiring procedures; the committee received a questionnaire *from Kilgore* concerning Brown's age, sex, and TFA affiliation; a memorandum from Dykes (which is not a part of the record), detailing her concerns with the second committee, went unanswered; and "Brown clearly was the most qualified person for the job".

Based primarily upon not being selected in 1997 as BLDT Dean, Brown filed this action in 1999 against Kilgore, Holda, and Stanglin, with federal law claims for gender (Title VII) and age

8

(ADEA) discrimination, equal protection violations (pursuant to 42 U.S.C. § 1983), and First Amendment (speech and assembly) retaliation (pursuant to § 1983). In their individual capacities, Holda and Stanglin were subject only to the § 1983 equal protection and First Amendment claims.

Kilgore, Holda, and Stanglin moved for summary judgment, including, *inter alia*, Holda and Stanglin's asserting qualified immunity from the retaliation claims at issue on this appeal. The magistrate judge's report and recommendation that the motion be denied was adopted by the district court. On motion for reconsideration, the district court dismissed the equal protection claim because Brown conceded it was duplicative of her Title VII and ADEA claims.

## II.

This interlocutory appeal by Holda and Stanglin concerns qualified immunity, in their individual capacities, from the First Amendment retaliation claims. In disputing Holda and Stanglin's being entitled to such immunity, Brown contends: (1) we lack jurisdiction because Appellants are challenging the sufficiency of the evidence; and (2) in the alternative, such immunity was properly denied because she asserted a clearly established constitutional violation.

## A.

Jurisdiction over an interlocutory appeal from the denial of summary judgment seeking qualified immunity is limited to "issues of law and 'concern[s] only [the] application of established legal

9

principles'". **Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.**, 229 F.3d 478, 482 (5th Cir. 2000) (alteration in original; quoting **Jones v. Collins**, 132 F.3d 1048, 1051 (5th Cir. 1998)). For a denial based on material fact issues, we may not "review the ... finding that particular factual issues are 'genuine'[, but we do] have jurisdiction to review the ... determination that certain facts (or factual disputes) are 'material' to the issue of qualified immunity". **Thompson v. Upshur County, Tex.**, 245 F.3d 447, 455-56 (5th Cir. 2001); *see also* **Gerhart v. Hayes**, 201 F.3d 646, 648 n.2, *rev'd in part on reh'g*, 217 F.3d 320 (5th Cir.) (deleting and substituting Part IV concerning whether speech was a matter of public concern), *cert. denied*, 121 S. Ct. 573 (2000); **Colston v. Barnhart**, 146 F.3d 282, 284-85 (5th Cir.) (en banc), *cert. denied*, 525 U.S. 1054 (1998). We must also consider "whether the district court applied the correct legal standard on summary judgment". **Gerhart**, 201 F.3d at 648-49.

Brown contends we lack jurisdiction, based on her assertion that Holda and Stanglin sought summary judgment premised on the insufficiency of Brown's evidence. "[W]e possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of events actually occurred". **Burge v. Parish of St. Tammany**, 187 F.3d 452, 479 (5th Cir. 1999). Holda and Stanglin respond that, instead, they present an issue of law: "Brown has failed to establish that any conduct of Holda or Stanglin violated a clearly established constitutional right".

10

We have jurisdiction to review the issues of law presented by this appeal: whether the district court applied the correct legal standard; and whether Holda or Stanglin violated a clearly established right, including, by necessity, whether Brown's speech constituted a matter of public concern.

B.

We review *de novo* the denial of summary judgment seeking qualified immunity, viewing the evidence in the light most favorable to the nonmovant (Brown). *See, e.g.,* **Lukan v. N. Forest Indep. Sch. Dist.**, 183 F.3d 342, 345 (5th Cir. 1999), *cert. denied*, 529 U.S. 1019 (2000); **Hale v. Townley**, 45 F.3d 914, 917 (5th Cir. 1995).

To determine whether a government official is entitled to qualified immunity, we apply the well-established, two-step analysis: whether the official violated a clearly established constitutional right; and, even if he did, whether his conduct was objectively reasonable. *See, e.g.,* **Lukan**, 183 F.3d at 345-46. Accordingly, prerequisite to such analysis on summary judgment is that Brown must show the violation of a clearly established right: she must allege, and show facts to support, every element of her First Amendment retaliation claims.

Such a claim requires showing each of the following elements: the employee suffered an adverse employment action; her speech involved a matter of public concern; her interest in commenting on such matters outweighs the defendant's interest in promoting efficiency; and the speech motivated the adverse employment action.

11

*Id.* at 346.  If plaintiff makes this showing, the defendant must show that, regardless of the protected conduct, it would have taken the same action against plaintiff.  *Id.*

Holda and Stanglin contend:  whatever speech Brown made, it was not on a matter of public concern; and neither Holda nor Stanglin *participated in conduct* which violated Brown's constitutional rights.  Brown maintains:  it is sufficient that she simply pleaded a constitutional violation; and her evidence established that "the unlawful motivation originating with [the Board] was implemented" by Holda and Stanglin.

The parties do not dispute that Brown suffered an adverse employment action.  And, Individual Defendants do not contest that, *if Brown spoke on a matter of public concern*, her speech concerns outweigh Kilgore's efficiency concerns.  Accordingly, we first examine whether Brown's speech was on a matter of public concern; if it was, we determine whether either Holda or Stanglin violated her constitutional (First Amendment) rights.  Finally, in the alternative, we will determine whether Holda's and Stanglin's conduct was objectively reasonable.

1.

"Whether the speech at issue relates to a matter of public concern is a question of law to be resolved by the court." *Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir. 1994) (citing *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9 (1987)).  "[T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little

12

moment". ***Terrell v. Univ. of Tex. Sys. Police***, 792 F.2d 1360, 1362 (5th Cir. 1986), *cert. denied*, 479 U.S. 1064 (1987). "Speech rises to the level of public concern when an individual speaks primarily as a citizen rather than as an employee." ***Bradshaw v. Pittsburg Indep. Sch. Dist.***, 207 F.3d 814, 816 (5th Cir. 2000) (citing ***Thompson v. City of Starkville***, 901 F.2d 456, 461 (5th Cir. 1990)). "[T]he content, form and context of a given statement, as revealed by the entire record" must be evaluated. ***Id.*** at 817 (quoting ***Denton v. Morgan***, 136 F.3d 1038, 1043 (5th Cir. 1998)).

Holda and Stanglin contend Brown's "speech" was neither by her nor on matters of public concern. The only speech Brown can specifically point to occurred in 1990, involving the reinstatement of students following an exam, *when Holda* was not in a decision-making position and *Stanglin* was not even employed by Kilgore. With respect to speech involving the TFA, although Brown attended Board meetings at which TFA members spoke, Brown did not speak. Her other alleged First Amendment activities involved (1) difficulty getting Board minutes for the salary study in 1990 (*when neither Holda nor Stanglin* were in decision-making positions) and (2) speaking in favor of TFA membership during the opening session at the start of a school year (although she can not remember exactly when this occurred).

Brown contends, however, that organizing, and activity in, faculty organizations, including requests for salary information and questioning salary practices, are clearly established constitutional rights. *See **Allaire v. Rogers***, 658 F.2d 1055, 1059

13

(5th Cir. Unit A Oct. 1981), *cert. denied,* 456 U.S. 928 (1982) (members of college faculty organizations requesting salary information); *Goss v. San Jacinto Jr. Coll.*, 588 F.2d 96, 99 (5th Cir. 1979) (efforts to organize local chapter of National Faculty Association); *Lewis v. Spencer*, 468 F.2d 553, 557 (5th Cir. 1972) (tenure advocacy and attempts to organize chapter of National Faculty Association). In addition, Brown contends other courts have found faculty member expression on student grading issues protected by the First Amendment. *See, e.g., Parate v. Isibor*, 868 F.2d 821, 828 (6th Cir. 1989); *Hesse v. Bd. of Educ. of Township High Sch. Dist. No. 211, Cook County, Ill*., 848 F.2d 748, 751 (7th Cir. 1988), *cert. denied,* 489 U.S. 1015 (1989).

Brown is incorrect that simply pleading a constitutional violation is sufficient to defeat a qualified immunity summary judgment. She must also produce affirmative evidence of specific facts to support each element of her First Amendment retaliation claims. *See Schaefer v. Gulf Coast Reg'l Blood Ctr.*, 10 F.3d 327, 330 (5th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)); FED. R. CIV. P. 56(c).

While we doubt Brown's vague references to "speech" are sufficient to defeat summary judgment, we will assume (as Individual Defendants seem to concede in their reply brief) that her comments regarding grading policies and her advocacy in TFA during the early 1990s amount to speech on a matter of public concern. She has, however, failed to identify any such speech that

14

occurred *after* Holda and Stanglin were placed in decision-making positions.

2.

The fourth element of a First Amendment retaliation claim requires showing plaintiff's speech motivated the adverse employment action. *See **Lukan***, 183 F.3d at 346. Brown must show her speech in the early 1990s was a "substantial or motivating factor in the" decision, *years later* (1997), by Holda and Stanglin to make Lewellen BLDT Dean, instead of her. ***Gerhart***, 217 F.3d at 321. Further, to be liable under § 1983, an individual defendant must have personally participated in the constitutional deprivation. ***Baskin v. Parker***, 602 F.2d 1205, 1208 (5th Cir. 1979).

Concerning the violation of a clearly established right, the magistrate judge identified Brown's association with TFA and improper questioning that occurred during her *1993 application* for Academic Dean. These events occurred *when Stanglin* was not even employed by Kilgore and *when Holda* was not in a decision-making role for the Dean position and are irrelevant to their individual liability without some proof that Holda and/or Stanglin were influenced by that conduct and, as a result, in 1997 made the decision adverse to Brown.

Brown further contends: in 1997, Stanglin changed the rules with regard to BLDT Dean selection procedures by dismissing the first selection committee for submitting written recommendations (this is discussed *infra*); and Holda and Stanglin are responsible

15

for the second committee's choosing Lewellen over her. This is not reflected in the summary judgment record.

Instead, the only evidence in the record is: Brown's speech was not considered in the 1997 decision to make Lewellen BLDT Dean, instead of her; Brown was ranked third (behind Lewellen) by the first selection committee; and Brown admits neither Holda nor Stanlgin has ever criticized her for any First Amendment activities. And, Brown concedes the TFA at Kilgore has, for all practical purposes, been inactive since Holda became President and Stanglin joined Kilgore.

Accordingly, Brown has produced no evidence that her speech motivated the conduct of Holda and Stanglin. Restated, each is entitled to qualified immunity, in their individual capacities.

3.

In the alternative, even if we were to find the decision to select Lewellen, instead of Brown, violated a clearly established right, there is sufficient evidence to show Holda and Stanglin acted in an objectively reasonable manner. *See* **Lukan**, 183 F.3d at 346. Along this line, there are no genuine issues of material fact precluding our review of this subpart for qualified immunity analysis.

In seeking to show Holda and Stanglin's actions were unreasonable, Brown: wrongly asserts the first BLDT Dean search committee recommended Brown (again, she was third); attempts to impute actions by individual members of the second search committee to Holda and Stanglin; and discusses events that preceded Holda's

16

tenure as President, as if they occurred during this opportunity for promotion. We are required to determine objective reasonableness based upon a version of the facts most favorable to the plaintiff, *see* **Lampkin v. City of Nacogdoches**, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994); we do so, nevertheless, based on the *evidence* in the summary judgment record.

As with our earlier determination regarding Individual Defendants' conduct, Brown has failed to show Holda and Stanglin took any action that was objectively unreasonable with respect to their decision to select Lewellen over Brown. While it is unclear why Stanglin instructed the first selection committee contrary to the published procedures, this issue, even if Brown could show the conduct was objectively unreasonable, is not material to Individual Defendants' entitlement to qualified immunity. In other words, it had nothing to do either with the selection by the first committee or with it being necessary to have a second committee *because* the first person selected was found *not qualified*.

Brown was considered by both committees and was even ranked below Lewellen by the first committee (the one Stanglin dismissed); Stanglin attended a meeting of the second selection committee to hear the strengths and weaknesses of each candidate; and Holda and Stanglin interviewed the candidates who were recommended by the committee, including Brown. Stanglin recommended Lewellen because, *inter alia*: his experience in workforce development, technical education, and contract training was superior to Brown; and Lewellen had strong communication, leadership, and team building

17

skills.  There is no action that either Holda or Stanglin took that was objectively unreasonable in their decision to select Lewellen rather than Brown.

III.

For the foregoing reasons, we **REVERSE** the denial of qualified immunity for Holda and Stanglin, in their individual capacities, from the First Amendment retaliation claims and **REMAND** for further proceedings consistent with this opinion.

***REVERSED and REMANDED***