Harvey A. THOMPSON,
Plaintiff–Appellee,

v.

CITY OF STARKVILLE, MISSISSIPPI,
David Lindley, Larry Sisk, and Jimmy
Raines, Individually and in their Official Capacities, Defendants–Appellants.

Nos. 89–4051, 89–4214.

United States Court of Appeals,
Fifth Circuit.

May 3, 1990.

William I. Gault, Jr., Miller, Milam &
Moeller, Jackson, Miss., for defendants-appellants.

Jim Waide, Tupelo, Miss., for plaintiff-appellee.

Before REAVLEY and KING, Circuit Judges, and HARMON, District Judge.[*]

KING, Circuit Judge:

Plaintiff-appellee, Harvey A. Thompson (Thompson), filed a section 1983 suit for injunctive relief and to recover damages for the termination of his employment as a police officer for the City of Starkville. He alleges that his termination was in violation of his first amendment right to free speech and his fourteenth amendment right to the equal protection of the laws. The Defendants-appellants, the City of Starkville, Mississippi (City), David Lindley (Lindley), Larry Sisk (Sisk) and Jimmy Raines (Raines) (collectively, the Defendants), filed a motion to dismiss or, alternatively, for summary judgment. The Defendants challenged both Thompson's first and fourteenth amendment claims and, in the alternative, Sisk, Raines and Lindley asserted a qualified immunity defense. Considering the Defendants' motion as one for summary judgment, the district court denied such motion. The Defendants now appeal the district court's denial of their summary judgment motion. After careful review, we affirm the district court's judgment with respect to Thompson's first amendment claim. As we find that Thompson failed to state a claim under the fourteenth amendment, we reverse the district court's judgment on this issue. We also affirm the denial of the individuals' qualified immunity defense.

I. Facts and Procedural Background

Thompson was a police officer for the City from May 1979 until November 1987 when he was fired. Thompson claims that his termination resulted from his exercise of his first amendment rights in the form of protesting certain promotions on the police force and aiding others in doing the same. His alleged speech took two forms. First, in October 1981, he filed a written grievance relating to the department promotion requirements. He noted that he was not allowed to take the sergeant's test in 1979 because he had not completed the then prerequisite of one year on the force and that he did not agree with his job ratings. In such grievance, he alleged that a number of promotions awarded by the department were not in accord with the department policies governing promotions. He stated that he felt that all promotions "outside" department policy should be rescinded. The department head responded negatively, and Thompson appealed to the personnel director, P.C. McLaurin, Jr. (McLaurin). After considering Thompson's allegations in his written grievance and the response of the department head, McLaurin concluded that the allegations lacked merit in relation to Thompson's complaints about his ratings, but that the City had erred in the 1981 round of promotions by allowing some officers to apply for promotions before the end of their probationary periods. He stated that such error would not be repeated in future promotion competitions.

Second, Thompson asserts that during his tenure as a police officer for the City he observed "acts of dishonesty and misconduct includ[ing] such matters as having extra-marital affairs while on duty, mistreatment of black persons, and theft of confiscated property." After several of the officers he observed engaging in such misconduct received promotions, Thompson alleges that he made a number of oral complaints about improper promotions and various acts of misbehavior on the part of other officers, and he aided others in filing similar grievances. In his affidavit before the district court, he states that a number of officers—including Lindley, Sisk and Raines, among others—lost promotions as the direct result of complaints lodged by him or that he helped prepare.

Thompson further alleges that his grievances and aid to others interested in filing

[*] Harmon, District Judge of the Southern District of Texas, sitting by designation.

grievances earned him the enmity of a number of members of the force, including the individual defendants. Most explicitly, Thompson alleges that Lindley said that he would "get even" with him and that Raines vowed to get him fired. According to Thompson, the individual defendants embarked upon a vendetta against him that ultimately led to his termination from the police force. In 1982, Thompson maintains that Lindley and Raines claimed that he had committed a burglary and that Sisk—attempting to have an action brought against Thompson—told the personnel officer for the City that Thompson committed the burglary as alleged by Raines and Sisk and was also a suspect in several other felonies being investigated. The case against Thompson for the alleged burglary was dismissed in a preliminary hearing. Thompson also claims that Lindley attempted to have him indicted on two other occasions.

In 1987, Thompson avows that Raines made a number of complaints against him. Pursuant to a complaint that he was engaging in an extra-marital affair, Thompson was found guilty of "conduct unbecoming to a police officer" and placed on probation. Thompson, however, alleges—and collected several supporting affidavits—that while affairs were common among police officers, he was the only one ever disciplined for such behavior. In fact, he asserts that Lindley engaged in an extra-marital affair during his on-duty hours, but received no punishment.

In the fall of 1987, acting Chief-of-Police Sisk recommended—and the Board of Aldermen of the City accepted such recommendation—that Thompson be terminated. Sisk based his recommendation on an accusation by Lindley that Thompson used unnecessary force in detaining a juvenile for questioning and failed to file a "use of force" report. The complaint against Thompson arose out of an investigation of "trespassing" at a shop. According to Thompson, he "grab[bed]" a young man who attempted to leave while he was questioning him and placed the young man in the police car while he continued his investigation. Thompson states that he used no unreasonable force and that he did not harm the young man and, therefore, never filed a report of the incident. In Thompson's view, his termination constitutes the culmination of the vow of Lindley, Sisk and Raines to achieve retribution for their earlier loss of promotions. For these reasons, Thompson alleges that his termination for the use of unreasonable force while on probation for "conduct unbecoming to a police officer" was pretextual and that he was truly fired for his exercise of his first amendment rights in complaining—in his words—"that officers were being promoted, not based on merit, but based upon political favoritism, and that officers guilty of dishonesty and misconduct were being promoted."

Thompson also contends that the treatment he received violates the equal protection clause of the fourteenth amendment because other officers who engaged in similar activities (e.g., having extra-marital affairs and using the same degrees of force as he allegedly did), but who made no complaints, were not fired. Consequently, on March 9, 1988, Thompson brought a section 1983 suit against the Defendants.[1] He sued the individual defendants in both their individual and official capacities.

The Defendants responded to Thompson's suit by filing a motion to dismiss, or alternatively, for summary judgment. The district court characterized the motion as follows:

The defendants move for summary judgment, stating that the individual defendants are protected by qualified immunity; that the City is entitled to summary judgment as plaintiff has failed to allege or produce facts to support a city policy which proximately led to the alleged deprivation; that the plaintiff's First Amendment claim is based on unprotect-

---

1. We note that March 9, 1988 was the date Thompson filed his original complaint, but he filed amended complaints on April 29, 1988 and June 2, 1988. The second amended complaint also contained allegations that Thompson's fourteenth amendment right to due process had been violated. Such claim was voluntarily dismissed, however, on July 28, 1988.

ed private-interest speech; and that plaintiff's equal protection claim is flawed because plaintiff has not sufficiently alleged class-based discrimination, and because the termination was rationally related to a legitimate state interest (footnote omitted).

Noting the documentation submitted with the motion and that submitted in response, the district court considered the motion as one for summary judgment and, on January 3, 1989, denied Defendants' motion for summary judgment. Sisk, Lindley and Raines appealed on the issue of their entitlement to qualified immunity.

Subsequently, on February 2, 1989—acting on the Defendants' motion—the district court also issued an order certifying interlocutory appeal. The district court viewed the following issues as central to its denial of Defendants' motion for summary judgment and worthy of interlocutory appeal:

(1) whether plaintiff's grievance protesting the promotion of certain persons within the police department, or assisting other police officers in filing similar grievances, gives rise to speech about issues of public concern so as to provide the basis of a First Amendment violation, and (2) whether plaintiff's proof establishes an issue for trial on his Fourteenth Amendment claim.

We granted the Defendants' motion to appeal the district court's interlocutory order and, on March 22, 1989, their motion to consolidate their appeals on the qualified immunity issue and the issues relating to the first and fourteenth amendments. We now affirm the district court's denial of summary judgment.

## II. Standard of Review

The issues relating to the first and fourteenth amendments in this case come before us on interlocutory appeal. Under section 1292(b), the district court may certify an otherwise unappealable order for appeal if the court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litiga-

tion. . . ." 28 U.S.C. § 1292(b); *see generally Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474–77, 98 S.Ct. 2454, 2460–62, 57 L.Ed.2d 351 (1978) (discusses general procedure and purpose of appeals under section 1292(b)).

Alternatively, Sisk, Raines and Lindley appeal the district court's finding, in its denial of summary judgment, that they are not entitled to qualified immunity. Since *Mitchell v. Forsyth*, it has been established that an appeal may be taken of a finding against qualified immunity where the issue involved is the purely legal one of "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took." 472 U.S. 511, 528 and n. 9, 105 S.Ct. 2806, 2816 and n. 9, 86 L.Ed.2d 411 (1985) ("We emphasize at this point that the appealable issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law."); *see also Brawner v. City of Richardson*, 855 F.2d 187, 190–91 (5th Cir.1988) ("A denial of summary judgment based on a claim of qualified immunity is an appealable final decision to the extent that it turns on an issue of law." (footnote omitted)). Thus, although "the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief[,]" as the issue involved is a legal one, we engage in a *de novo* review. *Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816.

## III. Discussion

■ In their appeal, the Defendants seek review and determination of the issues relating to Thompson's claims under the first and fourteenth amendments. They believe that his claims on these grounds should be dismissed. In the alternative, Sisk, Raines and Lindley assert that they are entitled to

a defense of qualified immunity. We consider each argument in turn.[2]

### A. Thompson's First Amendment Claim

The Defendants state that the first issue on appeal is whether Thompson's complaints and assistance to others in preparing and filing grievances constitute speech of public concern so as to form the core of a first amendment violation.[3] In denying the Defendants' motion for summary judgment on this issue, the district court rejected the Defendants' contention that the grievances involved were matters of purely private concern. Moreover, the district court noted that while Thompson originally filed his complaint following a denial of promotion, his subsequent pursuit of certain grievances did not benefit him directly in any manner.

■ It is well established that a public employee may not be discharged for exercising his or her right to free speech under the first amendment. *See, e.g., Page v. Delaune*, 837 F.2d 233, 237 (5th Cir.1988) ("A state may not discharge an employee for exercising his right to free speech on matters of public concern."); *Price v. Brittain*, 874 F.2d 252, 256 (5th Cir.1989); *Waters v. Chaffin*, 684 F.2d 833, 835–36 (11th Cir.1982) ("It is axiomatic that government employment may not be conditioned upon the relinquishment of constitutional rights."). In *Rankin v. McPherson*, where a clerical employee was fired—in the wake of an assassination attempt on the life of the President—for stating that she hoped anyone who made an attempt on the President's life in the future would succeed, the

Supreme Court stressed the protection of public employee's speech by stating: "Even though [plaintiff] was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression." 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987).

Case law, in this circuit, considering the question of whether particular speech by a public employee is protected has applied the following analysis:

> In order to establish a constitutional violation [the plaintiff] must first prove that her speech involved a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147 [103 S.Ct. 1684, 1690, 75 L.Ed.2d 708] ... (1983). Second, she must demonstrate that her interest in "commenting upon matters of public concern" is greater than the defendants' interest in "promoting the efficiency of the public services [they] perform." *Pickering v. Board of Education*, 391 U.S. 563, 568 [88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811] ... (1968). Third, she must show that her speech motivated the defendants' decision to fire her. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 [97 S.Ct. 568, 576, 50 L.Ed.2d 471] ... (1977).

*Frazier v. King*, 873 F.2d 820, 825 (5th Cir.), *cert. denied sub nom. Davoli v. Frazier*, —— U.S. ——, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989). Given the procedural posture of the instant case and limited na-

---

**2.** As an initial matter, we note that this case comes to us as an appeal of a denial of a summary judgment. Therefore, no factual findings were made below.

However, it is well established that in the summary judgment context all evidence produced by the nonmovant—Thompson, in this case—"must be viewed drawing all reasonable factual inferences in [his] favor." *See Barrett Computer Services, Inc. v. PDA, Inc.*, 884 F.2d 214, 217 (5th Cir.1989); *Baton Rouge Bldg. Constr. v. Jacobs Constructors*, 804 F.2d 879, 881 (5th Cir.1986) (per curiam); *cf. Thomas v. Harris County*, 784 F.2d 648, 653 n. 10 (5th Cir.1986) (per curiam) (plaintiff failed to allege precisely which of his activities led to his transfer—allegedly in viola-

tion of his first amendment rights—therefore, the court, in reviewing the grant of summary judgment against him, viewed his allegations in the manner it believed most favorable to him). Thus, in reviewing the issues at hand, Thompson's complaint and supporting affidavits must be read in the manner most favorable to him.

**3.** We note that Thompson alleges that this case involves not only his first amendment right to free speech, but also his first amendment rights to associate with others and his right to petition the government. However, given the limited scope of the issues before us on interlocutory appeal, we need not address these issues.

ture of the issues before us, at this point we reach only the threshold step of the above analysis, i.e., assuming that Thompson's allegations concerning his speech are true, whether such speech—consisting of both his oral and written complaints about allegedly unjust promotions and his assistance to others in filing grievances—constitutes a matter of public concern.[4]

In deciding whether the speech at issue—if it took place as alleged—constitutes a matter of public concern, we follow the dictates of the Supreme Court in *Connick*. 461 U.S. at 138, 103 S.Ct. at 1684. *Connick* instructs us to determine whether the speech at issue in a case can "be fairly characterized as constituting speech on a matter of public concern" before further analyzing allegations of unconstitutional restrictions on speech. 461 U.S. at 146, 103 S.Ct. at 1689. For "speech on public issues" occupies the " 'highest rung of the heirarchy [sic] of First Amendment values' " and is entitled to special protection." *Id.* at 145, 103 S.Ct. at 1689 (quoting *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) and *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)). However, if the "employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. at 1690. The rationale behind the public concern requirement is to prevent public employees from relying on the Constitution for redress of personal grievances. *Id.* at 149, 103 S.Ct. at 1691 ("While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.").

As guidance in determining whether speech addresses an issue of public concern, *Connick* further instructs us to consider "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690 (footnote omitted); *see also Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1577 (5th Cir.1989) ("We do not review the employee's words in a vacuum. Rather, we decide whether speech addresses a matter of public concern with reference to the 'content, form, and context of a given statement, as revealed by the whole record.' " (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690)), *cert. denied,* —— U.S. ——, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990). Despite such directions, and because of the case-by-case analysis required, the definition of the term "public concern" is far from clear-cut. *Kirkland v. Northside Indep. School Dist.,* 890 F.2d 794, 798 (5th Cir.1989) ("The definition of 'matters of public concern' is imprecise." (footnote omitted)); *Kurtz v. Vickrey,* 855 F.2d 723, 726 (11th Cir.1988) ("The meaning of the term 'public concern' is not without ambiguity....."); Note, *Freedom of Speech in the Public Workplace: A Comment on the Public Concern Requirement,* 76 Cal.L.Rev. 1109, 1110 (1988) ("[T]he Court has done little to clarify what types of public employee speech are consti-

---

**4.** As noted, *supra,* after concluding that speech addresses issues of public concern, "[t]he determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting efficiency....,'" *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). The state bears the burden of coming forth with evidence on this point. *See id.* at 388, 107 S.Ct. at 2898 ("The State bears a burden of justifying the discharge on legitimate grounds."). In the case, *sub judice,* however, the Defendants steadfastly maintained that Thompson's speech was not of public concern and, therefore, never offered any evidence relating to balancing at the trial court level. Additionally, no arguments concerning this issue were raised on appeal. Thus, we note that if Thompson's speech proves to be as he alleges and, consequently, a finding of public concern is made, the trial court may need to engage in such balancing (if the Defendants pursue the issue). We, however, do not address this issue.

tutionally protected or, more specifically, what constitutes a matter of public concern." (footnote omitted)). However, it is clear that "[t]he courts will not interfere with personnel decisions 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest.'" *Page*, 837 F.2d at 237 (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690); *see also Johnston*, 869 F.2d at 1577 ("As a general rule, when an employee speaks about matters that are of personal interest only, the speech does not address matters of public concern.").

### 1. Content

With the above teachings in mind, we turn to assessing whether Thompson's alleged speech in the case at hand falls within the nebulous category of "public concern." Although it is difficult to break public concern analysis down into hermetic categories of content, context, and form, we first consider the content of Thompson's speech. To support his claim that his speech relates to matters of public concern, Thompson points to the grievance he filed in 1981 concerning the uneven application of requirements for promotion; he also points to an affidavit that he filed in response to the Defendants' motion for summary judgment in which he detailed his complaints of misconduct on the part of City police officers.

Thompson's affidavit, *inter alia*, makes the following allegations:

> From practically the beginning of my employment, I observed acts of serious misconduct and dishonesty by certain fellow officers. These acts of misconduct included such matters as having extramarital affairs while on duty, mistreatment of black persons, and theft of confiscated property. In 1981, several of the officers who were guilty of this serious dishonesty and misconduct were promoted.... The reason the promotions were inappropriately made was because promotions were based upon political favoritism rather than upon merit.

His affidavit continues by detailing "tainted" promotions and threats allegedly made against him for complaining about such promotions and assisting others in filing similar complaints. He further asserts that several "ill-gotten" promotions were rescinded on account of his complaints.

Despite Thompson's submission of the affidavit, the Defendants focus on Thompson's 1981 grievance. The Defendants argue that, under *Connick*,[5] such grievance concerns only personnel policies and should not be recognized as constitutional in nature. If Thompson's written internal grievance comprised the only evidence before the court, we might be inclined to agree that his complaints largely revolved around internal personnel issues and the adversities that befell him and failed to demonstrate the existence of matters of public concern. However, reviewing the facts in the instant case, we see two distinct aspects to Thompson's speech: (1) his written grievance, which focuses largely on matters of personal interest and (2) his oral complaints and aid to others in filing grievances, which pertain to charges of egregious misconduct on the part of the police and address far more than one employee's

---

**5.** In *Connick*, an assistant district attorney, unhappy about a section transfer, wrote and distributed a questionnaire to her fellow employees. *Connick*, 461 U.S. at 138, 103 S.Ct. at 1684. Subsequently, because she refused to accept the proposed transfer, she was terminated and told that her distribution of the questionnaire constituted an act of insubordination. *Id.* She sued, alleging discharge in violation of her rights to free speech. The Supreme Court found that most of the questions on her survey related solely to personal grievances and reasoned:

> [Plaintiff] did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did [plaintiff] seek to bring to light actual or potential wrongdoing or breach of trust on the part of [the defendant] and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of [plaintiff's] questioning is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors.

> *Id.* at 148, 103 S.Ct. at 1690–91.

dissatisfaction with the status quo or his own lot. Thus, while Thompson's 1981 written grievance constitutes an integral part of Thompson's suit, the second and broader-based component of his speech—his affidavit—cannot be ignored. Moreover, given the summary judgment posture of this case, it must be construed to the extent reasonable in his favor. *Cf. Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.").

This court has held, albeit under different facts, that where speech "complained of misconduct within the police department, it should be classified as speech addressing a matter of public concern." *Brawner,* 855 F.2d at 192. If released to the public, Thompson's affidavit would expose possible corruption in the police force of the City. *Cf. Brawner,* 855 F.2d at 191–92 ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." (footnotes omitted)); *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988) (per curiam) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import."). Thus, the Defendants' simplistic argument that the substance of Thompson's grievance concerns only personnel policies fails to address the totality of Thompson's speech.

### 2. Context and Form

Although the Defendants fail to categorize their arguments explicitly as addressing content, context, and form—and repeatedly neglect to address the contents of Thompson's affidavit—they appear to assert that Thompson's alleged speech fails to meet the public concern threshold requirement because it arose in the context and form of an employee grievance on a matter of personal interest only, i.e., that the police de-

partment failed to follow personnel promotion policies and rated Thompson poorly. We reject the characterization of Thompson's grievances as addressing only matters of personnel policy; as we noted, *supra,* Thompson's affidavit allegations extend far beyond this limited vista. Thompson also chose to use internal grievances as the vehicles for bringing attention to his complaints, rather than approaching the media or otherwise publicizing his allegations of misbehavior within the police force. This alone, however, does not necessitate a finding that his alleged speech was not connected to matters of public concern.

To assess the impact of the form and context in which Thompson's speech arose, i.e., that Thompson was arguably an aggrieved public employee at the time he filed a complaint under the police department's internal grievance mechanism, we return to the Supreme Court's analysis in *Connick.* In *Connick,* the Supreme Court explicitly limited its findings in the following manner:

> We hold only that *when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision* taken by a public agency allegedly in reaction to the employee's behavior. . . . Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.

461 U.S. at 147, 103 S.Ct. at 1690 (emphasis added). The existence of an element of personal interest on the part of an employee in his or her speech does not, however, dictate a finding that the employee's speech does not communicate on a matter of public concern. In *Connick* itself, the Supreme Court found that the majority of the questionnaire handed out by an ag-

grieved employee addressed matters of personal concern, but that one issue raised—whether employees ever felt pressure to work on political campaigns—fell within the rubric of matters of public concern. *Id.* at 149, 103 S.Ct. at 1691. Therefore, the Court went on to engage in a balancing of the employee's interest in her speech and the government's interest in "effective and efficient fulfillment of its responsibilities to the public[ ]" in relation to this speech. *Id.* at 150, 103 S.Ct. at 1691.

Circuit courts have also recognized that an employee's speech may contain a mixture of public and personal concerns. For example, in *Gonzalez v. Benevides,* the plaintiff, the former Executive Director of the Laredo–Webb County Community Action Agency, was fired because he refused publicly to recognize the authority of the County Commissioners' Court to evaluate his performance. 774 F.2d 1295, 1298 (5th Cir.1985), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986). The plaintiff brought a suit under section 1983, "contending that his termination was an unconstitutional retaliation for protected speech and a violation of protected liberty and property interest." *Id.* In considering whether the plaintiff's speech constituted speech on a matter of public concern, the court held:

> [Plaintiff's] disagreement with the commissioners indisputably was a matter of concern to Gonzalez as an employee. *We do not read Connick, however, to exclude the possibility that an issue of private concern to the employee may also be an issue of public concern.* Indeed, the teacher dress code at issue in *Mount Healthy,* and the school bonds under discussion in *Pickering,* appear to have been "mixed" issues of both public and private concern.... We are persuaded that [the plaintiff] raised such a mixed issue.

*Id.* at 1300–01 (emphasis added); *see also Hall v. Ford,* 856 F.2d 255, 260 (D.C.Cir. 1988) ("But neither does a topic otherwise of public concern *lose* its importance merely because it arises in an employee dispute." (emphasis in original)); *Rode v. Dellarciprete,* 845 F.2d 1195, 1202 (3d Cir. 1988) ("Dismissing Rode's speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out."); *cf. Brawner,* 855 F.2d at 192 (This circuit has held that "it is clear that only a portion of a communication need address a matter of public concern." (footnote omitted)).[6]

Cognizant of these precedents, we find the Defendants' heavy reliance on *Terrell v. University of Texas System Police* to show that Thompson's alleged speech did not meet the public concern threshold misplaced. 792 F.2d 1360 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). In *Terrell,* a public employee, Terrell, was fired subsequent to his supervisor learning of his secret "notebook," containing entries critical of him (the supervisor). The *Terrell* court focused on the motivation behind Terrell's speech and found that, assuming the notebook constituted "speech," Terrell, nevertheless, failed to publicize such speech and "spoke" primarily as an employee concerning a dispute about his own employment. *Id.* at 1362–63. Therefore, the *Terrell* court found that such speech was not protected under the first amendment:

> Because almost anything that occurs within a public agency *could* be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was

---

**6.** The Tenth Circuit recently faced a similar issue. In *Wulf v. City of Wichita,* Wulf, a police officer, wrote to the State Attorney General with a number of complaints about the police chief and a request for investigation. 883 F.2d 842 (10th Cir.1989). He wrote such letter subsequent to his transfer to the Records Department, "which he viewed as retaliatory" for his activi-

ties as a member of the Fraternal Order of Police. *Id.* at 860 n. 26. The *Wulf* court held that, like the questionnaire at issue in *Connick,* "Wulf's letter, while arguably linked to some degree to his personal dispute with [the police chief] and to his dissatisfaction with his transfer, ... contains allegations of public concern." *Id.*

made primarily in the plaintiff's role as citizen or primarily in his role as employee.

. . . . .

[Terrell] made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have had any occasion to do so. The notes in question were made at a time when the Houston Department was already under investigation by the Director of the University System Police. That investigation, which was undertaken without any intervention outside of the government, had already suggested that Terrell himself was a leading cause of serious problems in the Houston Department. To whatever extent Terrell's notes suggested either that [Terrell's supervisor] had been guilty of mistakes or that Terrell was contemplating revelations that would be embarrassing to his supervisor, such suggestions were a wholly intragovernmental concern at the time Terrell was fired. The conclusion is inescapable: Terrell was not terminated for speaking "as a citizen upon matters of public concern." *Connick*, 103 S.Ct. at 1690, or for "speak[ing] out as a citizen on a matter of general concern, *not tied to a personal employment dispute*," *id.* at 1691 n. 8 (emphasis added) [sic].

792 F.2d at 1362–63 (footnote omitted). Employing the analysis adopted in *Terrell*,[7] we find that much of Thompson's speech

can be viewed as made primarily in his role as a citizen, rather than as an employee.

The case *sub judice*—as it involves a subject matter that has previously been found to be of public concern in this circuit[8] and not matters classically related only to internal personnel policies—differs factually from *Terrell* and other cases cited by the Defendants to demonstrate that Thompson's speech was mostly made as an employee rather than a citizen. In contrast to the facts in *Terrell*, Thompson did not clandestinely take notes about his superiors. Rather, through his own complaints and his aid to others filing complaints, he brought misbehavior to light within the police department and enabled corrections to be made.

Even in his 1981 grievance, Thompson responded to the question of what he felt would be the appropriate remedy for his complaints as follows:

I feel that any and all previous qualifications should apply in these promotions as they did in 1979. Also, that any and all hiring and promotions made outside of the department policy should be rescinded and those persons should be required to meet appropriate qualifications and the Department Head should show documented backing for his ratings of all persons being considered for promotions and that the City Board of Alderman [sic] should investigate all of the allocations [sic] here in [sic].

This response illustrates that Thompson stood to gain little personally through his grievance,[9] contrary to the Defendants' as-

---

7. For a discussion on the appropriateness of using employee motivation as the sole test for whether speech addresses issues of public concern, see *Kurtz*, 855 F.2d at 727.

8. *See Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir.1988).

9. Nor do we believe that this is a case, like *Moore v. Mississippi Valley State University*, where the speech that stands out as potentially rising above personal grievances was made "in terms of showing 'favoritism' to [one employee] . . ., not that this was a matter of public concern that ought to be stopped." 871 F.2d 545, 551 (5th Cir.1989). In *Moore*, daycare center employees who were not rehired, or who were demoted, sued, claiming, *inter alia*, that the changes in their status occurred in violation of

their first amendment rights. *Id.* The *Moore* court found that, generally, the employees' speech did not relate to matters of public concern and that the two complaints that did stand out as possibly involving matters of public concern (that a certain employee was permitted to carry a gun to work and that the same employee corporally punished children in the day school) "were recited solely as examples of the favoritism allegedly practiced by the supervisor . . . ." *Id.* at 551. The court concluded that "[t]he plaintiffs were requesting that the rules be enforced equally on all employees as a *matter of employer equality*, not as a matter of public safety." *Id.* In contrast, in the instant case, as Thompson's affidavit and written grievance (quoted, *supra*) and the fact that he aided others in filing grievances illustrate, Thompson's

sertion that Thompson's "personal interest of not being promoted [sic] obviously *predominated* any interest he may have had as a member of the general public" in filing his grievance. He did not seek back pay or promotion. Moreover, he aided others in filing similar complaints; these clearly did not redound to his own benefit. Furthermore, as the case at hand involves allegations of widespread misbehavior within the public police force—which could potentially affect public safety [10]—we cannot conclude that this case, like *Terrell*, involves a matter of purely intra-governmental concern. *Cf. Brawner, supra.* Thus, the fact that Thompson's initial written grievance may have been motivated by his own frustration with not having been allowed to sit the sergeant's exam in 1979 and with the ratings he received does not require a finding that his speech as a whole did not address a matter of public concern. The other component of his speech—his allegations of police misbehavior, made in his oral complaints as well as through his aid to others filing grievances—drew attention to matters well beyond any personal interest he might have had in filing his written grievance in 1981.

The fact that Thompson chose to communicate his grievances in a private, internal manner, instead of seeking to publicize his complaints, also fails to dispose of the issue of whether his alleged speech related to a matter of public concern. Rather, the publicization of the speech at issue, appropriately viewed, is simply another factor to be weighed in analyzing whether Thompson's alleged speech addressed matters of public concern. To hold otherwise would run counter to the analysis adopted by the Supreme Court on this point. In *Givhan v. Western Line Consolidated School Dis-*

*trict,* the Supreme Court expressly addressed this aspect of protection of speech:

> The First Amendment forbids the abridgment of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1978).[11] Thus, as the Eleventh Circuit has noted, "[a]lthough an employee's efforts to communicate his or her concerns to the public are relevant to a determination of whether or not the employee's speech relates to a matter of public concern, focusing solely on such behavior, or on the employee's motivation, does not fully reflect the Supreme Court's directive that the content, form, and context of the speech must all be considered." *Kurtz,* 855 F.2d at 727 (footnote omitted).

In *Rankin v. McPherson,* the Supreme Court reaffirmed the proposition that a public employee does not lose constitutional protection for his or her speech simply because the speech was made privately. 483 U.S. at 378, 107 S.Ct. at 2891. As mentioned, *supra,* in *Rankin,* a clerical employee of a county constable's office sued, alleging that she had been denied her constitutional right to free speech when the constable fired her for expressing hope that if anyone made an attempt on the President's life, he or she would succeed. *Id.* at 382, 107 S.Ct. at 2895. The statement was made in a private conversation about the President's policies and followed a news report about an attempt on his life. *Id.* at 381, 386, 107 S.Ct. at 2895, 2897.

---

allegations of misbehavior within the police force are more broadly-based and address a matter of public policy, not "mere favoritism," *id.,* within the police department.

**10.** For instance, in his affidavit, Thompson alleges that Lindley told him that he "had better not ever depend upon him [Lindley] as a back-up unit."

**11.** *Givhan,* decided in 1979, precedes *Connick* and, therefore, makes no reference to the public

concern threshold test. However, we note that *Connick* explicitly states that the speech of the plaintiff in *Givhan* addressed a matter of public concern. *See Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8; *see also Kurtz v. Vickrey,* 855 F.2d 723, 727 n. 4 (11th Cir.1988) ("Although *Givhan* was decided prior to *Connick,* and thus contains no discussion of the public concern threshold test, the Court's decision in *Connick* made clear that Mrs. Givhan's speech, which protested alleged racial discrimination, related to a matter of public concern.").

Despite the private nature of the communication, the *Rankin* court found the employee's speech protected and commented: "The private nature of the statement does not ... vitiate the status of the statement as addressing a matter of public concern." *Id.* at 386–87 n. 11, 107 S.Ct. at 2898 n. 11; *see also Brown v. Texas A & M Univ.*, 804 F.2d 327, 337 (5th Cir.1986) ("The fact that the speech was delivered privately to [plaintiff's] superiors, rather than to Bob Woodward and Carl Bernstein, does not necessarily render the speech any less protected." (footnote omitted)); *Davis v. West Community Hosp.*, 755 F.2d 455, 461 (5th Cir.1985) ("The fact, then, that the communications here were inhouse, does not necessarily destroy their protection under the first amendment, but it is part of the context of the communication to be considered in determining whether the speech addressed a matter of public concern.") Similarly, in the instant case, the fact that Thompson chose to make his superiors aware of his grievances (and to help others do the same), instead of alerting the public, does not preclude our finding that his alleged speech addressed issues of public concern. A holding to the contrary would mean that loyal employees seeking to rectify problems would lose constitutional protection for attempting to correct problems inhouse. Such a punitive result seems illogical where procedures have been established to encourage internal remedial actions.

■ In sum, our perusal of the entire record leads us to conclude that the form, content, and context of Thompson's alleged speech all create genuine issues of material fact as to whether his expression addressed matters of public concern. Should his allegations prove true, a finding that his speech addressed issues of public concern would be merited. In so holding, we stress the case-by-case analysis undertaken and focus on the fact that Thompson's allegations in his affidavit address issues far beyond those that other circuits have recognized as "internal grievances about working conditions: the length of time on the job, the number of breaks employees received and so forth." *Piver v. Pender*

*County Bd. of Educ.*, 835 F.2d 1076, 1079 (4th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988). In contrast to classic internal grievances, Thompson's speech points to misconduct on the part of various police officers with possible ramifications on public safety. Thus, we affirm the district court's denial of summary judgment on Thompson's first amendment claims.

**B. Thompson's Equal Protection Claim**

The Defendants also challenge the district court's denial of their summary judgment motion relating to Thompson's equal protection claim. In denying such motion, the district court stated that Thompson had alleged that he was treated differently from other officers who were "similarly situated," i.e., other officers who had engaged in extra-marital affairs and used the same amount of force as he did in questioning a juvenile. In his complaint, Thompson claimed that the divergent treatment resulted from his grievance filing, that is, his exercise of his first amendment rights. The district court considered Thompson's affidavit on this matter and the affidavits he obtained from other officers. Such affidavits stated that Thompson was the only police officer ever reprimanded for an extra-marital affair and that other officers used equal, or greater, amounts of force in questioning juveniles but that they were not disciplined or terminated. Thompson also offered affidavits of other officers stating that they were told it was only necessary to file a "use of force" report if they either struck the person being questioned or drew their weapons. The district court concluded that Thompson had succeeded in alleging a classification and that the City, which denies treating Thompson differently, had not offered a purpose for such divergent treatment. Thus, the district court found summary judgment inappropriate on this issue.

The Defendants submit two arguments in relation to this claim. First, the Defendants argue that summary judgment should have been granted because Thompson's equal protection claim simply restates

his first amendment claim. The Defendants also assert that Thompson fails to meet the classification requirement of equal protection analysis.

■ To support their first contention, the Defendants point to the underlying concern in *Connick, supra,* that public employees not be able to use the Constitution for protection in everyday employee-employer disputes. Their reliance on *Connick* is misplaced; the *Connick* court had no equal protection claims before it. Moreover, their argument assumes that Thompson cannot make an equal protection claim based on differential treatment due to his filing of grievances because, in their view, his first amendment rights were not violated. Contrary to such assumption, we have found that Thompson raised sufficient issues of fact about whether his alleged speech merits a finding of public concern to support a denial of the Defendants' motion for summary judgment on his first amendment claim. However, we agree with the Defendants that Thompson's claim under the equal protection clause amounts to no more than a restatement of his first amendment claim. In alleging that he belongs to a class of persons who were treated differently from others similarly situated because they filed grievances (in Thompson's view, a first amendment protected activity) Thompson attempts to create a classification for equal protection purposes based solely on his exercise of his first amendment right to free speech. In view of the fact that Thompson's right to free speech under the first amendment is essentially an individual right and that Thompson makes no claim that anyone other than he was similarly treated, we hold that Thompson

fails to state an equal protection claim. His recourse is solely under the first amendment.

## C. Qualified Immunity

■ Sisk, Raines and Lindley—the individual defendants—also challenge Thompson's claims on the basis of qualified immunity. Because we have found that Thompson's speech related to a matter of public concern, we must now address this defense.

Before the district court, the individual defendants offered qualified immunity as an alternative ground for granting summary judgment. Sisk, Raines and Lindley asserted, assuming *arguendo* that Thompson's speech was protected under the first amendment and that his allegations met the prerequisites for alleging a fourteenth amendment equal protection claim, they—as police officers—are entitled to qualified immunity. The district court found against them on the ground that Thompson produced evidence "from which a reasonable trier of fact could find a violation of plaintiff's constitutional rights, and the court now holds that, if these allegations are found to be true, the acts of the individual defendants were such that no reasonable official could have believed those actions to have been constitutionally or legally sound." We affirm the district court's judgment in regard to Thompson's first amendment claim.[12]

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in

---

12. In analyzing qualified immunity issues, this circuit normally requires a two step process: (1) "[t]he initial determination is whether the claim itself is viable, whether the actions of the plaintiff are constitutionally protected[ ]" and (2) if so, the next step is an evaluation of whether the "constitutional right asserted was 'clearly established' at the time of [the public official's] conduct so that a reasonable official would have understood that his conduct violated that right." *Brawner,* 855 F.2d at 191. In relation to the first step of this test, this circuit generally requires not only a determination of whether speech is public or private in nature, but also—

if the speech at issue is found to be public in nature—a balancing of "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. *See also Brawner,* 855 F.2d at 191–93; *Noyola v. Texas Dept. of Human Resources,* 846 F.2d 1021, 1025–26 (5th Cir.1988). However, as no one has raised any arguments relating to the balancing issue on appeal (*see, supra,* n. 4), we do not discuss it at this point.

light of the legal rules that were 'clearly established' at the time it was taken...." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982)). Thus, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 ("It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Elliott v. Perez,* 751 F.2d 1472, 1477 n. 13 (5th Cir.1985) ("Under the qualified immunity standard, government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

The inquiry in the instant case then turns on whether, assuming Thompson's allegations to be true, Raines, Sisk and Lindley violated rights of Thompson that were clearly established at the time of their actions. That is, whether the individual defendants would reasonably have known that their actions would violate Thompson's first amendment right to free speech. *See,*

*e.g., Brawner,* 855 F.2d at 192 ("'Clearly established' means that the contours of the right were so clear at the time the officials acted that a reasonable official would have understood that what he was doing violated that right." (footnote omitted)).

In 1981, Thompson filed a written grievance concerning the promotion of certain officers and the eligibility requirements for promotion. According to him, he also assisted others in filing grievances and made a number of oral complaints, the gist of which was "that officers were being promoted, not based on merit, but based upon political favoritism, and that officers guilty of dishonesty and misconduct were being promoted." In his complaint, he alleges that his grievances addressed, among other things, the wrongful promotions of the individual defendants in the case at hand. As a result of his actions, he asserts that a number of promotions—including those of Sisk, Raines and Lindley were "cancelled." In response to his actions, Thompson alleges that Sisk, Raines and Lindley engaged in a vendetta against him. To these ends, Thompson asserts that each of the three individual defendants participated in one or more of the following activities: accusing him of committing a burglary, alleging that he threatened another officer, and causing him to be disciplined for engaging in an extra-marital affair (while others engaging in the same conduct were not). Furthermore, Thompson contends that Sisk and Lindley were instrumental in ultimately having him fired—supposedly for using unreasonable force against a juvenile. Thompson sets forth these allegations in his complaint and affidavit.[13] The addition-

---

**13.** Aware of the necessity for plaintiffs invoking section 1983 to "plead specific facts that, if proved, would overcome the individual defendant's immunity defense [as] complaints containing conclusory allegations, absent reference to material facts will not survive motions to dismiss," we note the detailed nature of the allegations contained in the complaint and record of the instant case regarding Thompson's own actions and the behavior of Sisk, Raines and Lindley. *Geter v. Fortenberry,* 849 F.2d 1550, 1553 (5th Cir.1988); *see also Elliott v. Perez,* 751 F.2d 1472, 1479 (5th Cir.1985) ("In the now familiar cases invoking 42 U.S.C. § 1983 we consistently require the claimant to

state specific facts, not merely conclusory allegations." (footnote omitted)); *Brown v. Texas A & M Univ.,* 804 F.2d 327, 333 (5th Cir.1986) ("[T]he plaintiff must plead specific facts with sufficient particularity to meet all the elements necessary to lay a foundation for recovery, including those necessary to negative the defense of qualified immunity."); *Connelly v. Comptroller of the Currency,* 876 F.2d 1209, 1212 (5th Cir.1989) ("We have previously required a plaintiff to allege the facts underlying his claimed violation of constitutional rights with sufficient specificity to demonstrate that defendant's qualified immunity should be revoked."). Contrary

al affidavits he submits also support his allegations.

After extensive consideration (see discussion, *supra*), we have concluded that Thompson's activity, if it took place as he alleges, constitutes speech of public concern, and hence, Thompson's first amendment rights were at stake in his termination. *Cf. Kirkland*, 890 F.2d at 797 ("In *Connick v. Myers*, ..., the Court announced that the question of whether a public employee's speech is constitutionally protected turns upon the 'public' or 'private' nature of such speech."). Moreover, we find that by the time of Thompson's speech, it was well settled that public employees could not be fired for exercising their first amendment rights, even when such speech took place in a private forum. *See, e.g., Givhan*, 439 U.S. at 410, 99 S.Ct. at 693 (court found that teacher's speech concerning racial discrimination warranted first amendment protection, even though it was communicated privately to the school principal). Moreover, during the years in which the individual defendants were allegedly seeking to have Thompson fired, this court and the Supreme Court have repeatedly reaffirmed the protection accorded to speech by a public employee speaking out on matters of public concern, especially where the employee's speech exposes improper conduct on the part of other public employees. *See, e.g., Rankin*, 483 U.S. at 383, 107 S.Ct. at 2896 ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."); *Thomas v. Harris County*, 784 F.2d at 653 ("[Plaintiff police officer's] criticism of what he perceived to be special treatment afforded the River Oaks subdivision (and its private security force) addressed matters of public rather than purely private concern[ ]" and

is protected by first amendment, therefore, "the district court must determine whether Thomas' participation in protected first amendment activity prompted his superiors to retaliate against him....").[14]

Thus, we—like the district court—conclude that if Thompson's allegations relating to the behavior of the individual defendants prove true, such retaliatory behavior is not of a nature that any reasonable official could possibly have thought legitimate. *Cf. Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1212 (5th Cir. 1989) ("[T]he court must be certain that if the facts alleged by plaintiff are true, not withstanding any credibility disputes with defendants *then* a [constitutional] violation has clearly occurred." (emphasis in original)). Rather, in light of the law existing at the time of Thompson's speech, the individual defendants' alleged actions over the following six years were clearly unlawful. Therefore, we find that the district court properly denied summary judgment on the issue of the individual defendants' qualified immunity in relation to Thompson's first amendment claim. *Cf. Melear v. Spears*, 862 F.2d 1177, 1184 (5th Cir.1989) (in discussion of qualified immunity, the court held that where the "district judge may determine that a factual dispute exists that precludes summary judgment ... or ... a defendant may fail or choose not to move for summary judgment[,]" then "the trier of fact must determine the objective legal reasonableness of an officer's conduct by construing the facts in dispute." (footnote omitted)). Although it may be difficult to delimit exactly what conduct, in the abstract, violates a public employee's first amendment rights, a vengeful vendetta seeking an employee's job because of his speech on a matter of public concern surely falls within the ambit.[15]

to the Defendants' contentions, we find no flaw with regard to the specificity of the allegations contained in Thompson's complaint and the record in the instant case in relation to his first amendment claim.

**14.** This court has continued in the same vein to date. *See, e.g., Brawner*, 855 F.2d at 193 ("[A] reasonably objective public official would have known that termination of an employee for his

speech concerning misconduct by public officials would violate a clearly established constitutional right.").

**15.** Recently, in *Noyola, supra*, this court found that a former welfare services technician's comments to his supervisor regarding his allegedly unusually high caseload and implying that some cases should be redistributed for the efficient delivery of services, were not a matter of public

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the district court denying summary judgment to the Defendants in relation to Thompson's first amendment claim. In so holding, we make no findings as to whether Thompson will ultimately prevail, but find that his allegations, if true, support a holding that his speech addressed a matter of public concern. We reverse the judgment of the district court in relation to Thompson's equal protection claim and find that Thompson fails to state an equal protection claim. Additionally, we hold that the district court properly denied summary judgment to the individual defendants on the issue of qualified immunity in relation to the first amendment issue. Costs will be borne by the Defendants.

AFFIRMED in part, REVERSED in part.

concern and, therefore, such speech was not protected under the first amendment. 846 F.2d at 1021. The *Noyola* court went on to state, however, that even if it erred in finding the plaintiff's speech unprotected, the defendants were entitled to qualified immunity. *Id.* at 1024. In reaching such conclusion, the court made the following comments:

Determining whether a public employee has been discharged in violation of his first amendment free speech right utilizes case-by-case inquiry on two levels. *Connick v. Myers* ... decided by the Supreme Court the same year that [the plaintiff] was discharged, requires separate fact-specific consideration of (1) whether the speech is constitutionally protected and (2) if so, whether the discharge can be justified in order for the public office properly to perform its function. [citation omitted] ...

One consequence of case-by-case balancing is its implication for the qualified immunity of public officials whose actions are alleged to have violated an employee's first amendment rights. There will rarely be a basis for a

*priori* judgment that the termination or discipline of a public employee violated "clearly established" constitutional rights.

*Id.* at 1025. While we agree that many times it may be difficult to make such judgments at the outset, we believe that the case at hand exemplifies a situation in which such a judgment can be made. In the case *sub judice,* we have determined that Thompson's speech—if it is proven to have occurred as he alleges—qualifies for constitutional protection and that such constitutional protection was clearly established at the time of the speech. Thus in contrast to the facts in *Noyola,* we find that Thompson has raised a sufficient question of material fact to avoid a finding of qualified immunity for the individual defendants. *Cf. Brawner,* 855 F.2d at 192 ("[I]f the allegations of internal misconduct are indeed true, [plaintiff's] statements could not have adversely affected the proper functioning of the [police] department since the statements were made for the very reason that the department was not functioning properly due to corruption.").